No. 26-1525

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

JUSTIN BARTZ,
*Plaintiff-Appellant,*

v.

COLUMBIA COUNTY, ET AL.,
*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin
No. 3:24-cv-671— **Hon. James D. Peterson**, *Chief Judge.*

**PLAINTIFF-APPELLANT'S INITIAL BRIEF
AND SHORT APPENDIX**

Jacob M. Stroup
*Counsel of Record*
John H. Bradley
R. Rick Resch
William E. Grau
STRANG BRADLEY, LLC
613 Williamson St., Ste. 204
Madison, WI 53703
(608) 535-1550
Jacob@StrangBradley.com
John@StrangBradley.com
Rick@StrangBradley.com
William@StrangBradley.com

*Counsel for Plaintiff-Appellant Justin Bartz*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1525

Short Caption: Justin Bartz v. Columbia County, Wisconsin, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Justin Bartz

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Strang Bradley, LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Jacob M. Stroup Date: 3/20/2026

Attorney's Printed Name: Jacob M. Stroup

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 613 Williamson Street, Suite 204

Madison, WI 53703

Phone Number: 608-535-1550 Fax Number: 608-406-2602

E-Mail Address: Jacob@StrangBradley.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1525

Short Caption: Justin Bartz v. Columbia County, Wisconsin, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Justin Bartz

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Strang Bradley, LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ John H. Bradley Date: 3/20/2026

Attorney's Printed Name: John H. Bradley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 613 Williamson Street, Suite 204
Madison, WI 53703

Phone Number: 608-535-1550 Fax Number: 608-406-2602

E-Mail Address: John@StrangBradley.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1525

Short Caption: Justin Bartz v. Columbia County, Wisconsin, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Justin Bartz

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Strang Bradley, LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ R. Rick Resch Date: 3/20/2026

Attorney's Printed Name: R. Rick Resch

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 613 Williamson Street, Suite 204

Madison, WI 53703

Phone Number: 608-535-1550 Fax Number: 608-406-2602

E-Mail Address: Rick@StrangBradley.com

rev. 12/19 AK

Save As Clear Form



**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1525

Short Caption: Justin Bartz v. Columbia County, Wisconsin, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Justin Bartz

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Strang Bradley, LLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ William E. Grau Date: 4/7/2026

Attorney's Printed Name: William E. Grau

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 613 Williamson Street, Suite 204

Madison, WI 53703

Phone Number: 608-535-1550 Fax Number: 608-406-2602

E-Mail Address: William@StrangBradley.com

rev. 12/19 AK

## TABLE OF CONTENTS

Table of Authorities .................... viii

Jurisdictional Statement .................... 1

Statement of Issues .................... 1

Introduction .................... 1

Statement of the Case .................... 4

I. Nature of the Case .................... 4

A. The Initial Traffic Stop .................... 5

B. The Investigation Continues with a K-9 Sniff and Initial Searches .................... 6

C. After Messer and Hollander Come Up Empty, Bartz is Transported to Jail .................... 7

D. At the Jail, Bartz is Frisked Again, Searched Again, Run Through the Body Scanner, and Released .................... 8

II. Course of Proceedings and Disposition Below .................... 9

Summary of Argument .................... 9

I. Illegal Seizure .................... 10

II. Illegal Searches .................... 12

III. Qualified Immunity .................... 13

Standard of Review .................... 14

Argument .................... 14

I. General Fourth Amendment Principles .................... 14

II. The Defendants violated Bartz's Fourth Amendment rights when they drove him over 30 miles to the jail for the sole purpose of running him through a body scanner to search for evidence to justify his detention .................... 15

III. The Defendants violated Bartz's Fourth Amendments rights when they repeatedly searched him in the jail .................... 27

IV. The individual defendants are not entitled to qualified immunity ..... 33

Conclusion ..... 35

Certificate of Compliance with Cir. R. 32(c) ..... 37

Certificate of Service ..... 38

Statement of Compliance with Cir. R. 30(d) ..... 39

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. Gant*,
556 U.S. 332 (2009) ....15
*Arnold v. City of Chicago*,
776 F. Supp. 1259 (N.D. Ill. 1991) ....19
*Atwater v. City of Lago Vista*,
532 U.S. 318 (2001) .... 5, 20
*Bennett v. City of Eastpointe*,
410 F.3d 810 (6th Cir. 2005) ....25
*Brokaw v. Mercer County*,
235 F.3d 1000 (7th Cir. 2000) .... 26, 31
*Brown v. Knapp*,
75 F.4th 638 (6th Cir. 2023) .... 34, 35
*Brown v. Polk County*,
965 F.3d 534 (7th Cir. 2020) .... 29, 30, 31
*Cherrington v. Skeeter*,
344 F.3d 631 (6th Cir. 2003) .... 13, 34
*Chimel v. California*,
395 U.S. 752 (1969) ....28
*Chortek v. City of Milwaukee*,
356 F.3d 740 (7th Cir. 2004) .... 11, 18, 20
*County of Riverside v. McLaughlin*,
500 U.S. 44 (1991) ....Passim
*Dunaway v. New York*,
442 U.S. 200 (1979) ....16
*Farr v. Paikowski*,
No. 11-C-789, 2013 WL 160268 (E.D. Wis. Jan. 14, 2013) .... 21, 22, 24
*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*,
566 U.S. 318 (2012) .... 12, 28
*Florida v. Harris*,
568 U.S. 237 (2013) ....6
*Florida v. Jardines*,
569 U.S. 1 (2013) ....24
*Foster v. PNC Bank, Nat'l Ass'n*,
52 F.4th 315 (7th Cir. 2022) ....14
*Gerstein v. Pugh*,
420 U.S. 103 (1975) ....Passim
*Gramenos v. Jewel Companies, Inc.*,
797 F.2d 432 (7th Cir. 1986) ....16
*Hallstrom v. City of Garden City*,
991 F.2d 1473 (9th Cir. 1993) ....35

*Haro v. Porter County*,
129 F.4th 992 (7th Cir. 2025) .......... 29, 30
*Hope v. Pelzer*,
536 U.S. 730 (2002) .......... 33
*Hudson v. Palmer*,
468 U.S. 517 (1984) .......... 28
*Huff v. Reichert*,
744 F.3d 999 (7th Cir. 2014) .......... 6, 12, 35
*Jump v. Village of Shorewood*,
42 F.4th 782 (7th Cir. 2022) .......... 16
*Kemp v. Liebel*,
877 F.3d 346 (7th Cir. 2017) .......... 33
*Knowles v. Iowa*,
525 U.S. 113 (1998) .......... 25
*Lopez v. City of Chicago*,
464 F.3d 711 (7th Cir. 2006) .......... 13, 34
*Lyberger v. Snider*,
42 F.4th 807 (7th Cir. 2022) .......... 19
*Mary Beth G. v. City of Chicago*,
723 F.2d 1263 (7th Cir. 1983) .......... 12, 28, 29
*Maryland v. King*,
569 U.S. 435 (2013) .......... 13
*Missouri v. McNeely*,
569 U.S. 141 (2013) .......... 15
*Mitchell v. Doherty*,
37 F.4th 1277 (7th Cir. 2022) .......... 14, 17
*Monell v. Dep't of Soc. Servs. of City of New York*,
436 U.S. 658 (1978) .......... 4, 9
*Moore v. Marketplace Rest., Inc.*,
754 F.2d 1336 (7th Cir. 1985) .......... 2, 19, 21, 22
*Plumhoff v. Rickard*,
572 U.S. 765 (2014) .......... 33
*Rainsberger v. Benner*,
913 F.3d 640 (7th Cir. 2019) .......... 14
*Reed v. Palmer*,
906 F.3d 540 (7th Cir. 2018) .......... 33
*Riley v. California*,
573 U.S. 373 (2014) .......... 15
*Rodriguez v. United States*,
575 U.S. 348 (2015) .......... 20, 25
*Safford Unified Sch. Dist. No. 1 v. Redding*,
557 U.S. 364 (2009) .......... 33
*Scott v. Harris*,
550 U.S. 372 (2007) .......... 14

*Sheik-Abdi v. McClellan*,
37 F.3d 1240 (7th Cir. 1994) ....................26
*Smith v. Finkley*,
10 F.4th 725 (7th Cir. 2021) ....................33
*Smith v. Rowe*,
761 F.2d 360 (7th Cir. 1985) ....................26
*Terry v. Ohio*,
392 U.S. 1 (1968) ....................6
*United States v. Brunilda Garcia*,
605 F.2d 349 (7th Cir. 1979) ....................32
*United States v. Daniels*,
64 F.3d 311 (7th Cir. 1995) ....................Passim
*United States v. Davis*,
174 F.3d 941 (8th Cir. 1999) ....................20
*United States v. Edwards*,
415 U.S. 800 (1974) ....................28
*United States v. Glenna*,
878 F.2d 967 (7th Cir. 1989) ....................16
*United States v. Ienco*,
182 F.3d 517 (7th Cir. 1999) ....................15
*United States v. Leo*,
792 F.3d 742 (7th Cir. 2015) .................... 32, 35
*United States v. Newton*,
369 F.3d 659 (2d Cir. 2004) ....................16
*United States v. Ricardo Garcia*,
376 F.3d 648 (7th Cir. 2004) .................... 2, 5, 15, 25
*United States v. Robinson*,
414 U.S. 218 (1973) .................... 28, 32
*United States v. Serna-Barreto*,
842 F.2d 965 (7th Cir. 1988) ....................16
*United States v. Sholola*,
124 F.3d 803 (7th Cir. 1997) ....................24
*United States v. Thomas*,
79 F. App'x 908 (7th Cir. 2003) ....................16
*Wayland v. City of Springdale, Ark.*,
933 F.2d 668 (8th Cir. 1991) .................... 11, 20
*Webb v. Thompson*,
643 F. App'x 718 (10th Cir. 2016) ....................35
*Webster v. Gibson*,
913 F.2d 510 (8th Cir. 1990) .................... 11, 19
*Willis v. City of Chicago*,
999 F.2d 284 (7th Cir. 1993) ....................12, 21, 22, 24, 34

Statutes

28 U.S.C. § 1291 .......... 1
28 U.S.C. § 1331 .......... 1
28 U.S.C. § 1391(b)(2) .......... 1
42 U.S.C. § 1983 .......... 1, 4, 26
Wis. Stat. § 895.46 .......... 4

Rules

Fed. R. Civ. P. 56(a) .......... 14

Other Authorities

3 W. LaFave, Search and Seizure §5.1(g) .......... 25

## JURISDICTIONAL STATEMENT

Plaintiff Justin Bartz filed this case on September 24, 2024. R. 1. The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331, because the claims arise under the Fourth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. The Plaintiff's claims arose within the geographic boundaries of the Western District of Wisconsin within the meaning of 28 U.S.C. § 1391(b)(2).

Bartz's appeal is taken from the final judgment in favor of Defendants entered on March 2, 2026. R. 50. The District Court judgment was final as to all the claims and all the parties before it.

The United States Court of Appeals for the Seventh Circuit has jurisdiction to decide this case pursuant to 28 U.S.C. § 1291. The Notice of Appeal was filed with the District Court on March 17, 2026. R. 52.

## STATEMENT OF ISSUES

1. After a K-9 alert, can a police officer drive someone 30 miles to a jail solely to run them through a body scanner, or must they secure a warrant?
2. Can police and correctional officers frisk, search, and run a person through a body scanner at a jail without ever booking the person, or must they secure a warrant?
3. Are Defendants entitled to qualified immunity?

## INTRODUCTION

On May 14, 2023, Justin Bartz was a passenger in a truck that was pulled over for a defective registration lamp. What began as a normal traffic stop devolved into a series of fruitless and progressively invasive searches, culminating in Defendants Columbia County

Sheriff's Deputies Robin Messer and Noah Hollander driving Bartz 30 miles to the Columbia County Jail and scanning his body in an attempt to locate nonexistent contraband.

After a K-9 alerted on Bartz's truck, Messer and Hollander searched the truck and found nothing of interest. Then they searched Bartz's person and again came up empty-handed. Faced with a fruitless vehicle search and a fruitless search of Bartz, the deputies had to decide what to do. What they chose was unconstitutional—after conferring with Defendant Haueter, they drove Bartz to jail to search his insides by running him through a body scanner. If they found contraband, they would book him. If they didn't, they would let him go.

In other words, they continued to detain Bartz not because they had found evidence against him, but because they had not. They detained him not with the intent to book him, but with the intent to search for evidence to justify the arrest in the first place. That was an impermissible seizure under *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).

Under *McLaughlin*, when law enforcement makes a warrantless arrest, they must move toward a judicial probable cause determination without unreasonable delay. 500 U.S. at 56. The *McLaughlin* Court cited as a textbook example of unreasonable delay exactly what happened here: "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest." *Id*.

Had Defendants actually booked Bartz and begun moving him toward a probable cause determination, they could have used the body scanner as part of that process. But that isn't what happened. And the "sole permissible interest of the state in detaining a person after arrest is to ensure their presence at trial." *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1350 (7th Cir. 1985); *see also United States v. Ricardo Garcia*, 376 F.3d 648, 650 (7th Cir. 2004)

("the reasonableness of a search or seizure depends on what actually happens rather than what could have happened").

Once at the jail, Bartz was repeatedly searched and frisked by Defendant Jail Officer Mitchell Wolfgram. Then, on Messer's order, Defendant Jail Officer Scout Bahr ran Bartz through the jail's body scanner, even though every Defendant knew that Bartz wasn't at the jail to be booked. He was released after the body scanner search showed no contraband again. None of this was done in furtherance of jail security. These were all warrantless searches for evidence.

The District Court erred in determining that the Defendants' actions complied with the Constitution. In the District Court's view, the Defendants were justified in hauling Bartz to the jail because there was probable cause to arrest him. R. 49 at 4–6. The District Court further determined that the searches of Bartz's person were reasonable. *Id*. at 8. These determinations were in error.

The District Court's analysis strayed when it focused on answering the question of whether there was probable cause to arrest Bartz. Probable cause is a red herring. What matters is the "purpose" of the seizure. *McLaughlin*, 500 U.S. at 56. *Gerstein* and *McLaughlin* *assume* probable cause. They address what happens *after* an otherwise-valid warrantless arrest and the obligations of law enforcement to move toward a judicial probable cause determination. Further, the District Court relied on *United States v. Daniels*, 64 F.3d 311 (7th Cir. 1995), a case neither party cited because it is readily distinguishable.

And as to the unlawful searches, the District Court correctly noted that "Bartz's situation can't fully be justified by general jail policies, because he was brought to the jail for the purpose of conducting the body scan." R. 49 at 8. Yet it still erroneously gave the frisks and pocket searches its seal of approval based on cases that rely on "general jail policies." *See id*.

This case is important not just for Justin Bartz, but for all motorists. If the Defendants are correct, whenever a K-9 alerts on a car and police come up empty-handed, they can search inside the body of the car's occupant. A person could be transported to a jail miles away, forced to undress, repeatedly searched, and scanned—all without a warrant. No exception to the Fourth Amendment's warrant requirement permits such a result. Officers cannot use their authority to arrest as a substitute for the warrant they never sought and the judicial review they never invited. This Court should reverse and remand with directions to enter partial summary judgment as to liability in favor of Bartz.

## STATEMENT OF THE CASE

### I. Nature of the Case

Plaintiff Justin Bartz filed this 42 U.S.C. § 1983 action against six Columbia County Sheriff's deputies,[1] alleging that the deputies violated his Fourth Amendment rights during a traffic stop and subsequent interaction in May of 2023. Bartz additionally alleged a *Monell*[2] claim against Columbia County, as well as naming the County as an indemnitor for the individual defendants.[3]

The District Court granted the County's motion for summary judgment and denied Bartz's motion for partial summary judgment as to liability. R. 49. Accordingly, the District Court entered judgment in favor of the County and dismissed the case. R. 50.

[1] The individual defendants are Robin Messer, Noah Hollander, Scout Bahr, Jill Ostrander, Mitchell Wolfgram, and Jordan Haueter.

[2] *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The District Court dismissed the *Monell* claim, and Bartz does not contest this dismissal on appeal. Likewise, Bartz does not contest the dismissal of his failure to intervene claims on appeal.

[3] *See* WIS. STAT. § 895.46; R. 13 (amended complaint) at 14–17.

**A. The Initial Traffic Stop**

On May 14, 2023, around 10:38 p.m., Columbia County Sheriff's Deputy Robin Messer pulled over a truck on Highway 151 near Columbus, Wisconsin, for having non-functioning registration lamps. R. 21 at 12:2–18; R. 29-7 at 3. Before Messer approached the truck, Deputy Noah Hollander arrived at the scene. R. 21 at 12:19–13:13. Messer then approached the truck and identified the driver as Cody Parpart and the passenger as Justin Bartz. *Id*. at 13:10–25. Both Bartz and Parpart told Messer that they did not have valid driver's licenses. *Id*. at 14:1–8. They also told Messer that they were coming from Madison, where they had been visiting a friend for about 30 to 45 minutes. R. 29-1 at 00:01:57–00:02:20. Bartz, the owner of the truck, provided Messer with his registration, but he couldn't find his proof of insurance. *Id*. at 00:02:30–00:03:00.

Messer told Bartz to continue looking for his proof of insurance and returned to his squad car. *Id*. at 00:02:55–00:03:30. While in the squad car, Messer printed a ticket for Parpart for operating with a suspended license. R. 21 at 17:24–18:2. His plan at that point was to issue the ticket to Parpart, issue various warnings to both Bartz and Parpart, and not arrest either of them for these minor traffic violations. *Id*. at 18:3–25. Messer could have arrested and booked Bartz and Parpart. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). But he didn't—which is important because in the Fourth Amendment context the relevant inquiry is what an officer does, not what he could have done. *Ricardo Garcia*, 376 F.3d at 650.

While Messer prepared the citation and ran a records check, Hollander walked into the ditch near the back passenger side of the truck. R. 22 at 12:20–13:3; R. 29-2 at 00:06:05–00:08:07. Although the angle and reflecting light made it difficult to see, Hollander reported that he saw Bartz open the center console, reach in, and then close it. R. 22 at 22:12–15, 13:15–19. He thought that Bartz grabbed something, but he had "no idea" what it was. *Id*. at 15:3–

22. Bartz later explained he was looking for his proof of insurance as Messer had asked him to do. R. 29-1 at 01:05:32–01:05:55.

Soon after, Messer returned to the truck and issued the citation and warnings. *Id*. at 00:11:06–00:11:31. He explained to Bartz and Parpart that they were free to go, but they couldn't drive the truck away because neither had a valid license. *Id*. at 00:11:30–00:11:40. Thus ended the original traffic stop. *See Huff v. Reichert*, 744 F.3d 999, 1006 (7th Cir. 2014).

**B. The Investigation Continues with a K-9 Sniff and Initial Searches**

But the investigation was not over. In fact, it was only the beginning. Directly after issuing the citation and warnings, Messer asked if there was anything illegal in the truck, which Bartz denied, and whether he could search the truck's interior while Bartz and Parpart waited for a ride, to which Bartz declined to consent. R. 29-1 at 00:11:55–00:12:05. After Bartz declined consent to search the truck, Messer returned to his squad car and retrieved his K-9, Rico, and ran Rico around the truck. *Id*. at 00:12:10–00:13:04. Rico allegedly alerted on the driver's side of the truck. *Id*. at 00:12:55–00:13:05; R. 21 at 25:17–20.

The dog's alert gave Messer and Hollander probable cause to search the vehicle and reasonable suspicion to initiate a second *Terry* seizure of Bartz and Parpart. *Florida v. Harris*, 568 U.S. 237, 247 (2013); *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Bartz consented to be searched, and Messer conducted a frisk and pocket search, which turned up no contraband. R. 29-1 at 00:18:30–00:20:00; R. 21 at 35:20–24. After the search, Messer put Bartz in the back of his squad car. R. 21 at 36:21–24. Hollander similarly searched Parpart, and this search was similarly fruitless. R. 22 at 27:24–28:14. Messer then searched the truck—an exhaustive search of the front and back seats, compartments, and bed that took about 15 minutes—and again found no contraband. R. 21 at 39:1–7. After the truck search, Messer again ran Rico around the truck, and Rico allegedly did not alert. R. 29-1 at 00:30:58–00:33:20.

After striking out on the searches, Messer questioned Bartz, which led to an admission from Bartz that he had smoked marijuana earlier in the evening in Madison (in a different county). R. 29-1 at 00:37:25–00:38:55. Yet Messer testified that he never intended to arrest or book Bartz into the jail for smoking marijuana. R. 21 at 49:1–14, 50:6–10. Instead, he responded to Bartz by saying, "Now I understand why the dog alerted to the vehicle." R. 29-1 at 00:40:47–00:40:56. Messer placed Bartz back in the squad car and joined Hollander for his questioning of Parpart. *Id*. at 00:41:20–00:41:50.

### C. After Messer and Hollander Come Up Empty, Bartz is Transported to the Jail

After the deputies put Parpart through field sobriety tests (which did not result in an arrest), Messer called his K-9 supervisor, Jordan Haueter. *Id*. at 00:42:15–00:52:31, 01:00:30–01:02:45; R. 21 at 57:16–21.; R. 24 at 23:2–5. Haueter gave his approval to transport both Bartz and Parpart to the Columbia County Jail for body-scanner searches, with instructions to release them if the scanner found nothing. R. 21 at 58:4–59:5; R. 24 at 23:6–24:23, 31:9–32:23. When Haueter gave his approval, he knew that Bartz and Parpart were near Columbus, about 30 miles away from the jail; that Bartz, Parpart, and the truck had already been searched; and that no drugs or other contraband had been found. R. 24 at 30:11–31:8.

Consistent with Haueter's approval, Messer ordered both Bartz and Parpart be taken to the jail to go through the body scanner. R. 21 at 59:12–60:11, 61:8–15; R. 29-1 at 01:03:20–01:04:25, 01:05:55–01:06:48. Bartz did not consent to being transported to the jail. R. 21 at 61:13–15. He was then placed in handcuffs. *Id*. at 62:9–13; R. 29-1 at 01:06:50–01:07:50. An hour and ten minutes after the traffic stop began, Messer drove Bartz 35 more minutes to the Columbia County Jail. R. 21 at 66:3–6, 16–19. In all this time, Messer could have easily sought a warrant, but he didn't. And he loaded up Bartz and drove him across the County despite having no intent of booking Bartz into the jail (unless the body scanner found something)—indeed, he reiterated while Bartz was being handcuffed that if nothing was

found on his person, he would be released,[4] which is indeed what happened. R. 29-1 at 01:07:03–01:07:08.

### D. At the Jail, Bartz Is Frisked Again, Searched Again, Run Through the Body Scanner, and Released

Messer, with Bartz in his squad car, arrived at the Columbia County Jail at 12:25 in the morning. R. 21 at 66:16–19. From the moment he arrived, the purpose of the visit was clear. While Messer and Bartz were waiting after their arrival at the jail, Defendants Mitchell Wolfgram and Jill Ostrander entered the waiting area. R. 29-1 at 01:50:34–01:50:37. Ostrander immediately said, "Just for the body scan?" and Messer replied, "Yep." *Id*. at 01:50:37–01:50:42.

Wolfgram then frisked Bartz and searched his pockets. *Id*. at 01:50:45–01:51:00. He did this despite knowing that Messer had already frisked Bartz. R. 23 at 14:17–20. He did this without having any reason to believe that Bartz was armed and dangerous. *Id*. at 15:3–13. And then less than three minutes later, he did it again. R. 29-1 at 01:53:26–01:53:40. Ostrander and Messer stood by and watched on both occasions. *Id*. at 01:50:45–01:53:40. The searches turned up no contraband. R. 23 at 16:25–17:2. Bartz did not consent. *Id*. at 17:16–18.

Ostrander then ordered Bartz to change into jail pants. R. 29-1 at 01:53:47–01:54:22. Again, Bartz did not consent. R. 21 at 76:3–5. He was forced to go into a changing room, remove his pants, and put on jail pants while Wolfgram was in the room with him. R. 29-1 at 01:54:57–01:55:26.

While Bartz was changing his pants, Messer informed Defendant Scout Bahr, who was running the body scanner, of the situation. That is, he told her that the K-9 had alerted to the vehicle, and he had decided to bring Bartz into the jail to be scanned to see if the item

[4] The same is true of Parpart. Hollander was explicit about this in his communications with Parpart, at one point telling him that if the body scan found nothing illegal, "I'll shake your hand and tell you to have a good day." R. 22 at 40:10–17; R. 29-2 at 01:08:06–01:08:10.

he had supposedly removed from the center console was in his body. *Id*. at 01:55:34–01:55:52; R. 21 at 76:17–24. After Bartz emerged from the changing room, Bahr ordered him into the scanner and scanned his body while Messer and Wolfgram looked on. *Id*. at 01:56:29–01:57:41. As Bartz was being scanned, Wolfgram picked up the pants Bartz had changed out of and searched the pockets for a third time. *Id*. at 01:56:36–01:57:41.

The body scan turned up no contraband. R. 21 at 77:14–17; R. 29-6. Same with the scan of Parpart. R. 29-6. After a two-hour ordeal, Bartz and Parpart were both released. R. 29-7 at 4. They were never booked into the jail. *Id*.

### II. Course of Proceedings and Disposition Below

Bartz filed this suit on September 24, 2024. R. 1. Ultimately, he raised claims for (1) unlawful seizure, unlawful arrest, or failure to intervene; (2) unlawful strip search or scan of person or failure to intervene; (3) illegal frisk or failure to intervene; (4) unlawful search or failure to intervene; and (5) a *Monell* claim for unlawful search and seizure against Columbia County. R. 13. The County filed a motion for summary judgment, and Bartz filed a motion for partial summary judgment as to liability. R. 26, 32.

After briefing on the cross-motions, the District Court granted the County's motion for summary judgment and denied Bartz's motion for partial summary judgment. R. 49. Accordingly, the District Court entered judgment for the County. R. 50. Bartz now appeals.

## SUMMARY OF ARGUMENT

Bartz has a Fourth Amendment right to a judicial determination of probable cause. Once he was arrested, the Defendants needed to secure a probable cause determination to hold him. Alternatively, they could have sought a search warrant, based on probable cause, to search him. They did neither.

The Defendants violated Bartz's rights when they de facto arrested him and transported him 30 miles in a squad car to the Columbia County Jail for the sole purpose of

running him through a body scanner to search for evidence to justify the arrest. They violated his rights again at the jail, where they (1) repeatedly frisked him and searched his pockets despite knowing that he had already been frisked and searched and (2) subjected him to an invasive body scan (neither of which turned up any contraband). The rights the Defendants violated are clearly established, so they are not entitled to qualified immunity.[5]

There are no material facts in dispute here. This Court should reverse the District Court's decision and remand with directions to grant Bartz's motion for partial summary judgment against Defendants Messer, Hollander, and Haueter as to the illegal seizure; Defendants Messer, Haueter, and Bahr as to the illegal body scan; and Defendant Wolfgram as to the illegal frisk.

## I. Illegal Seizure

*Gerstein* and *McLaughlin* establish that when a person is arrested without a warrant, law enforcement must take steps toward a judicial probable cause determination without "unreasonable delay." *McLaughlin*, 500 U.S. at 56; *see Gerstein*, 420 U.S. at 125 (the probable cause "determination must be made by a judicial officer either before or promptly after arrest"). It is the quintessential "unreasonable delay" to "gather[] additional evidence to justify the arrest." *McLaughlin*, 500 U.S. at 56. That is exactly what happened here.

Bartz was brought to the jail "just for the body scanner." R. 29-1 at 01:50:37–01:50:42. Officers did not plan to book Bartz into the jail. Unless they found something in the body scan, that is. Thus, officers readily admit that the purpose of the trip to the jail was investigative. This violates *Gerstein* and *McLaughlin*.

---

[5] Because the District Court concluded that the Defendants' actions were constitutional, it did not specifically address qualified immunity. R. 49 at 8. This Court should reach and address that issue here.

The District Court focused on the wrong question. Rather than analyzing whether the purpose of the trip was investigative, it homed in on whether there was probable cause to arrest Bartz. It concluded that there was probable cause to arrest Bartz, and that this dispositively foreclosed Bartz's claim because the "existence of probable cause is an absolute defense to unlawful arrest claims." R. 49 at 4.

But the District Court did not recognize the fundamental difference between a *Gerstein* claim and a run-of-the-mill false arrest claim. "A false arrest claim alleges lack of probable cause. A *Gerstein* claim alleges lack of the opportunity for a prompt judicial determination of probable cause. *The claims are not identical and, therefore, are not subject to the same analysis*." *Webster v. Gibson*, 913 F.2d 510, 513 n.7 (8th Cir. 1990) (emphasis added). Indeed, it is ultimately irrelevant to the analysis whether there was probable cause to arrest Bartz. *Gerstein* and *McLaughlin assume* probable cause. "*Gerstein* may be violated even in situations where probable cause for the arrest exists." *Wayland v. City of Springdale, Ark.*, 933 F.2d 668, 670 (8th Cir. 1991); *Chortek v. City of Milwaukee*, 356 F.3d 740, 746 (7th Cir. 2004) (noting that "unreasonable delays, even within the forty-eight hour period, may be constitutionally troublesome").

The District Court's tunnel vision on probable cause led it to *United States v. Daniels*, 64 F.3d 311, a case neither party cited and is easily distinguishable from the case at hand. In short, Daniels received a timely probable cause determination: officers intended to arrest Daniels, *did arrest Daniels*, and put Daniels in lineups to bolster their case against him prior to his *Gerstein* hearing. 64 F.3d at 313.

Contrast that sequence of events with that in the present case. Officers had no intention of arresting and booking Bartz; they did not book him into jail, he never received a probable cause determination, and their investigative searches were not intended to *bolster* their case but to *make* it in the first place. And the *Daniels* Court itself recognized this

distinction: "*Gerstein* and its progeny simply prohibit law enforcement from detaining a defendant to gather evidence to justify his arrest, *which is a wholly different matter*." *Id*. at 314 (emphasis added).

*Daniels* is therefore inapposite. This Court has a line of cases, based on *McLaughlin*, that controls here, beginning with *Willis v. City of Chicago*, 999 F.2d 284, 288–89 (7th Cir. 1993). The District Court did not address *Willis*. This case presents the archetypal delay that the Court in *McLaughlin* cited as unreasonable: delay for the purpose of "gathering additional evidence to justify the arrest." *McLaughlin*, 500 U.S. at 56. Officers' seizure of Bartz violated his Fourth Amendment rights.

## II. Illegal Searches

The searches at the jail were unconstitutional because they were the result of an illegal seizure. *Huff*, 744 F.3d at 1009. But even if the Court disagrees with Bartz on the constitutionality of the seizure, the searches were still unreasonable.

On the roadside, Bartz's vehicle was searched, he was frisked, and his pockets were searched. After he was transported to the jail, he was frisked again (twice), had his pockets searched again (twice), and was made to change clothes and have his body scanned. Officers knew he had already been frisked and searched, and that no contraband was found, yet they subjected him to repeated searches all the same. Each of these searches revealed the same thing: that Bartz did not have any contraband.

Officers may perform a search incident to arrest due to "the need to remove any weapons that the arrestee might seek to use in order to resist arrest or effect his escape and the need to prevent the concealment or destruction of evidence." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1270 (7th Cir. 1983). And in the institutional setting, the need for such a search may be heightened. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330–32 (2012). But when a person is not being booked into the jail, the rationale

underlying such a search vanishes. These were not mere frisks. They were warrantless searches for evidence. The Defendants thus need an exception to the warrant requirement. The safety and security of the jail cannot justify the escalating searches of Bartz because officers admit that Bartz was never going to enter the jail population. *Cf. Maryland v. King*, 569 U.S. 435, 465 (2013) (warrantless stationhouse DNA swab was a "reasonable search that can be considered part of a routine booking procedure").

The District Court's decision purported to recognize this key point, yet still premised its analysis on cases that rely on institutional concerns. There was no intake. There can therefore be no intake search. And in any event, it is unreasonable to repeatedly conduct frisks and pocket searches when, both on the roadside and just moments before, such searches revealed nothing of investigative interest. Thus, even if Bartz's detention passes constitutional muster (it doesn't), the searches at the jail violated his Fourth Amendment rights.

### III. Qualified Immunity

The Defendants are not entitled to qualified immunity. *Gerstein* and *McLaughlin* clearly establish the relevant legal principles. Since *McLaughlin* was decided in 1991, it has been clearly established that delays following arrest for the purpose of "gathering evidence to justify the arrest" are unconstitutional. *McLaughlin*, 500 U.S. at 56. This Court has described that holding as "unequivocal," and other Circuits have followed suit in denying qualified immunity on the basis of *Gerstein* and *McLaughlin*. *Lopez v. City of Chicago*, 464 F.3d 711, 722 (7th Cir. 2006); *see, e.g.*, *Cherrington v. Skeeter*, 344 F.3d 631 (6th Cir. 2003).

*McLaughlin's* rule is clear and specific. Any reasonable officer aware of the United States Supreme Court's statement in *McLaughlin* would know that a suspect cannot be arrested for the purpose of further investigation to justify the arrest. At that point, a judge

must become involved—either to bless the arrest or to search. The Defendants are not entitled to qualified immunity.

## STANDARD OF REVIEW

This case arrives before this Court on an appeal of the District Court's summary judgment decision. A District Court's grant of summary judgment is reviewed de novo. *Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; FED. R. CIV. P. 56(a). All justifiable inferences are drawn in favor of the nonmoving party. *Foster*, 52 F.4th at 320. There are no material facts in dispute in this case. All that remains are legal questions: were the seizure and searches of Bartz reasonable under the Fourth Amendment? *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (the reasonableness of a deputy's actions presents "a pure question of law").

## ARGUMENT

### I. General Fourth Amendment Principles

Arrests must be supported by a judicial finding of probable cause, whether a warrant has issued or not. When an arrest warrant issues, that means that a judge has examined the basis for the arrest and found probable cause. *Rainsberger v. Benner*, 913 F.3d 640, 650 (7th Cir. 2019). On the other hand, if an arrest takes place without a warrant, certain requirements kick in mandating that the arrestee be taken before a judge for a determination that the arrest is supported by probable cause. *See Gerstein*, 420 U.S. at 114. As this Court has explained: "An arrest must be supported by probable cause. But while prearrest review is preferred, a requirement that an officer always obtain an arrest warrant ahead of time would handicap law enforcement." *Mitchell v. Doherty*, 37 F.4th 1277, 1279 (7th Cir. 2022) (internal citations omitted). "Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate." *Id.* (quoting *Gerstein*, 420

U.S. at 114). Accordingly, the Supreme Court has determined that a person arrested without a warrant must appear before a neutral magistrate within 48 hours of arrest. *McLaughlin*, 500 U.S. at 56. This must occur without "unreasonable delay." *Id*.

If law enforcement wants to conduct a search, they generally need a warrant. *Riley v. California*, 573 U.S. 373, 382 (2014). Any search conducted without a warrant is presumptively unreasonable. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). A warrantless search of a person is reasonable only if it falls within a recognized exception to the warrant requirement. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013); *Riley*, 573 U.S. at 382.

## II. The Defendants violated Bartz's Fourth Amendment rights when they drove him over 30 miles to the jail for the sole purpose of running him through a body scanner to search for evidence to justify his detention.

After searches of Bartz, Parpart, and the vehicle came up empty-handed, Defendants decided to undertake a plainly unconstitutional course of action. They handcuffed Bartz, loaded him into a squad car, and drove him 30 miles. The purpose of this sojourn was to run Bartz through a body scanner. If Defendants found contraband, Bartz would be booked into the jail. If not, he would be released. In other words, the entire purpose of the trip to the jail was to search for evidence to justify the detention. This is an unlawful seizure, and the Fourth Amendment does not countenance such an action.

As an initial point, Bartz was under de facto arrest. A seizure turns into a de facto arrest "when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (cleaned up). Being handcuffed and taken to the jail is a quintessential arrest, regardless of what law enforcement may call it. *See Ricardo Garcia*, 376 F.3d at 651 ("Police officers' diction does not affect the constitutional inquiry.").

Perhaps no physical act is more associated with "formal arrest" than handcuffing. *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989) (explaining that "handcuffs are restraints on freedom of movement *normally* associated with arrest"); *Jump v. Village of Shorewood*, 42 F.4th 782, 792 (7th Cir. 2022) (indicating that a person was "arrested at handcuffing"); *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest" and collecting cases). And taking one to the station house is another near-universal indicator of an arrest. *See United States v. Serna-Barreto*, 842 F.2d 965, 966 (7th Cir. 1988); *United States v. Thomas*, 79 F. App'x 908, 912 (7th Cir. 2003); *Dunaway v. New York*, 442 U.S. 200, 212 (1979).

Despite Messer's statement that Bartz was merely "detained," in reality Bartz was de facto arrested. *See* R. 21 at 62:14–20, 73:1–3. Messer likely called the seizure a "detention" because he never intended to book Bartz into the jail. And because Bartz was not being booked into the jail, the full array of intake searches was unavailable to the arresting officers. But he was arrested, which means that the arresting officers must either take steps to bring him before a magistrate or else release him. *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 437 (7th Cir. 1986).

Two United States Supreme Court decisions explain why. The first of these is *Gerstein*, 420 U.S. 103. In that case, the Supreme Court considered a Florida law that allowed prosecutors to charge all non-capital offenses by information "without a preliminary hearing and without obtaining leave of court." *Id*. at 105. The legal question presented was "whether a person arrested and held for trial on an information is entitled to a judicial determination of probable cause for detention." *Id*. at 111. The Court answered the question affirmatively: "Whatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty,

and this determination must be made by a judicial officer either before or promptly after arrest." *Id*. at 125. This Court has further explained *Gerstein*'s reasoning:

> An arrest must be supported by probable cause. But while prearrest review is preferred, a requirement that an officer always obtain an arrest warrant ahead of time would handicap law enforcement. "Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate." Thus, the Court concluded, the Fourth Amendment mandates a prompt "judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest."

*Mitchell*, 37 F.4th at 1279–80 (internal citations to *Gerstein* omitted). Florida's system of detaining a person by a prosecutor's information thus violated the Constitution. *Id.* at 1280.

The *Gerstein* Court did not, however, answer the question of "just how promptly the state must provide a probable-cause determination." *Id*. at 1280. This question was addressed in the second of our key background cases, *County of Riverside v. McLaughlin*, 500 U.S. 44. In *McLaughlin*, a class of plaintiffs challenged the procedures the County used to make probable-cause determinations after warrantless arrests. County policy combined a probable cause determination with arraignment, which needed to be conducted within two days of arrest. *Id*. at 47. But this two-day requirement excluded weekends and holidays, so an individual arrested without a warrant late in the week could be held as long as five days before receiving a probable cause determination, and one arrested just prior to the Thanksgiving holiday could end up waiting seven days. *Id*.

Although the Court "hesitate[d] to announce a specific time limit," it referenced such a limit "to provide some degree of certainty so that States and counties may establish procedures with confidence that they fall within constitutional bounds." *Id*. at 56. Specifically, it determined: "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id*.

But the Court was also clear that "[t]his is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably." *Id*. The Court provided as examples of unreasonable delay "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id*.

The pairing of *Gerstein* and *McLaughlin* thus stands for the following propositions:

(1) The Fourth Amendment requires a judicial determination of probable cause either before the arrest or promptly after.

(2) An officer's on-the-scene assessment may provide legal justification for the arrest, but once that assessment is made, there must be a *judicial* determination of probable cause. *Gerstein*, 420 U.S. at 113–14, 124–25.

(3) Once at the station, absent an arrest warrant, officers must move towards the judicial probable cause finding with no "unreasonable delay." *McLaughlin*, 500 U.S. at 56.

(4) And it is an "unreasonable delay" to delay seeking a probable cause determination "for the purpose of gathering additional evidence to justify the arrest." *Id*.

These principles apply to an arrest for a minor offense or a traffic ticket just as they do to more serious crimes. *Chortek*, 356 F.3d at 746. In *Chortek*, this Court applied *Gerstein* and *McLaughlin* to ticket scalpers, who were arrested, booked, and released, where neither "extended detention [] nor probable cause hearings were contemplated." *Id*. Thus, *Chortek* stands for the principle that a fine-only arrest, where no judicial finding of probable cause

is even possible, still must be reasonable and not for the sole purpose of investigating a crime.

Consequently, for any arrest, the "sole permissible interest of the state in detaining a person after arrest is to ensure their presence at trial." *Moore*, 754 F.2d at 1350. Law enforcement cannot work backward—an arrest cannot be a pretext for an investigation seeking evidence to justify the arrest in the first instance.

The District Court's analysis in this case answered the wrong question. Rather than focusing on whether the Defendants took steps in furtherance of a judicial probable cause determination without unreasonable delay, it instead examined whether there was probable cause to arrest Bartz. R. 49 at 4–5. This misframes the issue.

The District Court truncated its analysis after identifying the principle that the "existence of probable cause is an absolute defense to unlawful arrest claims." R. 49 at 4 (citing *Lyberger v. Snider*, 42 F.4th 807, 811 (7th Cir. 2022)). While that may be true as a technical matter, it is irrelevant to the case at hand because Bartz's claim here is not a simple unlawful arrest claim—it is a *Gerstein* claim. *See* R. 13 at 12 (amended complaint pleads a claim for *unlawful seizure*, unlawful arrest, or failure to intervene). "A false arrest claim alleges lack of probable cause. A *Gerstein* claim alleges lack of the opportunity for a prompt judicial determination of probable cause. *The claims are not identical and, therefore, are not subject to the same analysis*." *Webster*, 913 F.2d at 513 n.7 (emphasis added); *Arnold v. City of Chicago*, 776 F. Supp. 1259, 1264 (N.D. Ill. 1991) (explaining that "a finding of probable cause for arrest does not estop an extended detention claim").

It is thus ultimately irrelevant whether there was probable cause to arrest Bartz.[6] *Gerstein* and *McLaughlin assume* probable cause. Indeed, "*Gerstein* may be violated even in

[6] This is why, even though he maintained that officers did not have probable cause to arrest him for smoking marijuana in Madison, Bartz conceded the point below. R. 27 at 12 n.2. As Bartz argued to

situations where probable cause for the arrest exists." *Wayland*, 933 F.2d at 670; *see United States v. Davis*, 174 F.3d 941, 944 (8th Cir. 1999) (explaining that "the fact that probable cause supported the initial arrest does not make Davis' subsequent detention constitutional"); *Chortek*, 356 F.3d at 746 (noting that "unreasonable delays, even within the forty-eight hour period, may be constitutionally troublesome"). What matters is that a *judge* says there's probable cause. And *that's* significant here because a Columbia County judge may have said there was not. If the Defendants believed they had reason to arrest or further search Bartz, they needed to present their investigation to a judge.

If probable cause were the beginning and end of the analysis, a host of Fourth Amendment case law would be rendered meaningless. To explain, if the District Court's analysis were correct, any motorist pulled over for a minor traffic violation could be frisked and have their person and car searched solely because the officer *could* have arrested them for the traffic offense. *See Atwater*, 532 U.S. at 323. But the "could have" rationale fails in the face of the Supreme Court's own statement that the "reasonableness of a seizure . . . depends on what the police *in fact do*." *Rodriguez v. United States*, 575 U.S. 348, 357 (2015) (emphasis added). Accepting the District Court's analysis would undermine the holding of *Rodriguez*, under which independent reasonable suspicion is required to prolong a traffic stop to conduct a K-9 sniff after the mission of the stop is complete. *Id*. at 357–58. The K-9 sniff cannot be justified because officers *could have* made an arrest but did not. So contrary to the District Court's approach, probable cause cannot be the dispositive question.

Rather, what is at issue here is what law enforcement may constitutionally do with a person *after* a warrantless arrest, not whether there was probable cause for the arrest in the first place. The framework for what officers may do after an arrest is provided by *Gerstein*

---

the District Court, "[r]egardless of whether the Defendants had probable cause for *any* crime, their actions violated Bartz's Fourth Amendment rights." *Id*.

and *McLaughlin*. And these cases forbid exactly what Defendants did here: using the power to arrest and detain not to move toward a neutral judicial probable cause determination, but rather "for the purpose of gathering additional evidence to justify the arrest." *McLaughlin*, 500 U.S. at 56. The Defendants had no interest in ensuring Bartz's presence at trial because they didn't plan on bringing charges against him. *See Moore*, 754 F.2d at 1350.

This case is akin to *Willis*, 999 F.2d at 288–89. In *Willis*, although law enforcement did not have a warrant for Willis's arrest, they convinced him to go to the station with them, where they interrogated him, put him through a series of lineups, and contacted other police units to see if he was a suspect in any other crimes. *Id*. at 285–86. Charges were eventually processed against Willis, and after being held for 45 hours, he received a probable cause hearing. *Id*. at 286, 288.

Even though a delay of 45 hours "generally complies with *Gerstein*," this Court determined that Willis "demonstrated convincingly the unreasonableness of his prolonged detention." *Id*. at 288. This was because, although the detention was within *Gerstein*'s 48-hour limit, the seizure was unconstitutional because officers used custodial power as an investigative tool. *See id*. at 288–89. In other words, it is not the length of the detention that is dispositive of the violation—it is the purpose of the detention.

The same principle was at work in *Farr v. Paikowski*, No. 11-C-789, 2013 WL 160268 (E.D. Wis. Jan. 14, 2013). There, the plaintiff was arrested, transported to the station, questioned for investigative purposes, and released without booking after being detained for about 2 ½ hours. *Id*. at *3–*5. The defendants conceded "that the real purpose for arresting Farr was simply to interrogate her…and then let her go." *Id*. at *7. This concession was fatal to the defendants' case, rendering "Farr's detention *per se* unreasonable under *Gerstein*." *Id*. Judge Randa observed that "the sole permissible interest of the state in detaining a person after arrest is to ensure their presence at trial," and that Farr's detention

had no relation to that purpose. *Id*. (quoting *Moore*, 754 F.2d at 1350). Likewise here. Defendants here admit that the real purpose for arresting Bartz was to search him and then let him go. *Farr* and *Willis* provide both the relevant legal principles and similar dispositive facts. The same result as in those cases should follow.

And Bartz's case presents an even more egregious violation than that in *Willis*. While the Court in *Willis* concluded that it was unreasonable to detain Willis "solely to permit the police to place him in lineups relating to other uncharged crimes," it also noted that "such delay is not explicitly mentioned as unreasonable in *McLaughlin*." *Id*. at 288–89. The violation, therefore, was established by analogy. In *McLaughlin*, "the Court condemned delays for the purpose of 'gathering additional evidence to justify the arrest' as unreasonable and thus determined them to be an illegitimate basis for postponing a judicial determination of probable cause." *Id*. at 289 (citing *McLaughlin*, 500 U.S. at 56). The situation in *Willis* was analogous because in "both circumstances, a person is subjected to unreasonably prolonged custody without judicial scrutiny so that the police can undertake further investigatory steps that require the presence of the defendant, a presence that cannot properly be required without a prior judicial determination of probable cause." *Id*. at 289.

Here, the violation is of the *exact* type cited by the *McLaughlin* Court. No analogy is required. The admitted purpose of Bartz's sojourn to the jail was to "gather[] additional evidence to justify the arrest." *See McLaughlin*, 500 U.S. at 56. This violates the Fourth Amendment.

Yet the District Court did not cite *Willis* in its summary judgment decision. Instead, it focused on *Daniels*, 64 F.3d 311, a case neither party cited and is readily distinguishable: Daniels was booked, processed, and received a probable cause hearing. 64 F.3d at 313. While Daniels was awaiting his probable cause hearing, law enforcement bolstered its case against him. *Id.* at 314. Bolstering is not justifying because it creates no delay.

Daniels was suspected of a bank robbery in Milwaukee. *Id*. at 313. Police showed a photo array to three bank employees who witnessed the robbery. *Id*. Two employees selected a photograph of Daniels, and a third could not identify the robber in any of the pictures. *Id*. Police later showed the same photo array to two customers who witnessed the robbery. *Id*. One selected the photo of Daniels but could not be sure without seeing him in person, and the other selected a photograph of a different person as the one most resembling the robber. *Id*.

Based on the witness identifications in the photo array, as well as a statement from a confidential informant that Daniels had committed two unsolved bank robberies, law enforcement arrested Daniels without a warrant. *Id*. About 27 hours after his arrest, he participated in a lineup. *Id*. Only one of the witnesses was able to positively identify Daniels as the robber. *Id*.

Daniels argued that the lineup violated *Gerstein* and *McLaughlin* because it was being used to collect evidence to justify his arrest. *Id*. at 314. This Court disagreed. Specifically, it determined that the lineup "was not conducted to justify Daniels' arrest; it was done to collect more evidence against Daniels." *Id*. The Court continued: "Daniels' argument seems to interpret [*McLaughlin*] to preclude law enforcement from bolstering its case against a defendant while he awaits his *Gerstein* hearing; that is a ludicrous position." *Id*. "*Gerstein* and its progeny simply prohibit law enforcement from detaining a defendant to gather evidence to justify his arrest, *which is a wholly different matter*." *Id*. (emphasis added). In other words, Daniels was on track to have a probable cause hearing, and the fact that the investigation continued during his wait was unobjectionable.

Bartz's detention, in contrast to Daniels's, was for the express purpose of gathering evidence to justify the arrest, which the *Daniels* Court itself declared is a "wholly different matter." *Id*. How do we know that gathering evidence to justify the arrest was the purpose

of Bartz's detention? Because the Defendants said so. Had they disputed the purpose of the trip to the jail, there might have been a material factual dispute here. *Compare United States v. Sholola*, 124 F.3d 803 (7th Cir. 1997) *with Willis*, 999 F.2d at 288–89.

The *Sholola* Court distinguished *Willis* in that the investigatory purpose of the detention had been conceded and was plain in *Willis*. *Sholola*, 124 F.3d at 820–21. Judge Wood further elucidated this distinction in her concurrence, observing that in *Willis*, government officials admitted that the detainee was being held for the sole purpose to gather evidence, while in *Sholola*, the District Court found that government officials did not hold the detainee solely for that purpose. *Id*. at 823–24 (Wood, J., concurring); *see also Farr*, No. 11-C-789, 2013 WL 160268, at *7 (no trial necessary where defendants conceded that the purpose of the arrest was to interrogate the plaintiff and then let her go).[7]

But this case is *Willis* not *Sholola*. The record is replete with facts reflecting Defendants' intent that the trip to the jail was "just for the body scanner," *not* for booking in the jail—if nothing was found in the scan, Bartz would be released. R. 21 at 49:11–14, 60:9–23; R. 22 at 40:6–20; R. 24 at 31:9–32:23; R. 29-1 at 01:50:37–01:50:42; R. 29-7 at 4.

And that's what happened. The scan revealed no contraband, and Bartz was released (albeit miles from his home and vehicle and without transportation). If Bartz's trip to the jail was "to collect *more* evidence…rather than to *justify* his arrest" as the District Court determined, R. 49 at 6, then why wasn't Bartz booked into the jail based on the evidence officers had? Why was he released when the body scan revealed no contraband? The answer is because the scan was not meant to collect *more* evidence, and everyone involved knew it.

[7] The reference to an officer's "purpose" does not mean that the inquiry is subjective. Rather, the question remains one of objective facts. *See Florida v. Jardines*, 569 U.S. 1, 10 (2013) ("Here, their behavior objectively reveals a purpose to conduct a search….").

It was meant to justify the arrest. When no contraband was found, it was clear the arrest was not justified, resulting in Bartz's release.

The District Court concluded that this case was like *Daniels* because "Messer had probable cause to arrest Bartz before transporting him to the jail, so conducting further searches of Bartz at the jail to bolster the case against him was not unlawful under *Gerstein* and [*McLaughlin*]." R. 49 at 6. But what was the "case" against Bartz? We don't know because he was never booked, and there was never any plan to book him if the scan revealed nothing. If the transportation to the jail were to "bolster" the case against Bartz, he would presumably have still been booked. He was not. There was nothing to "bolster." *Cf.* 3 W. LaFave, SEARCH AND SEIZURE §5.1(g), p. 76 n.326 (6th ed. 2020) (citing *Daniels* for the proposition that "a probable cause determination within 48 hours does not constitute a case of unreasonable delay merely because in the interim the police bolstered their case *re the offense charged*") (emphasis added). The scan was the sole determining factor as to whether Bartz would be booked or released—it was a search for justification.

That the Defendants could have booked Bartz into the jail is of little moment because, in the Fourth Amendment context, what matters is not what officers *could have* done, but what they *actually* did. Indeed, the Supreme Court has stated that the "reasonableness of a seizure . . . depends on what the police in fact do." *Rodriguez*, 575 U.S. at 357 (citing *Knowles v. Iowa*, 525 U.S. 113, 115–17 (1998)); *Ricardo Garcia*, 376 F.3d at 650 (explaining that "the reasonableness of a search or seizure depends on what actually happens rather than what could have happened"). An officer cannot choose not to book a person and still reap the benefits that booking them would have afforded. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 824 (6th Cir. 2005) ("The mere fact that an officer has the *authority* to arrest an individual does not, and never has, automatically permitted the officer to conduct a pat-down search should he choose *not* to effectuate the arrest.").

So, when officers transported Bartz to the jail, they needed to move toward a probable cause determination by a magistrate, not go fishing for evidence that would justify the detention in the first place (which they did not find). Instead, they explicitly stated that they would release Bartz if they found nothing, and book him into the jail if they found something. R. 21 at 60:9–23; R. 24 at 31:9–32:23. This is the quintessential "unreasonable delay" the *McLaughlin* Court warned against. Because law enforcement did not move toward a probable cause determination but instead arrested Bartz with the sole purpose of ferreting out evidence to justify the arrest, the seizure was unlawful, and the District Court erred in determining otherwise.

Deputy Messer and Lieutenant Haueter are directly liable for the illegal seizure. Messer seized Bartz and transported him to the jail "just for the body scanner," and Haueter gave his explicit approval of this plan.

An officer is liable under Section 1983 when she causes or participates in a constitutional violation. *Brokaw v. Mercer County*, 235 F.3d 1000, 1012 (7th Cir. 2000) (causes); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994) (participates). "An official causes a constitutional violation if he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Brokaw*, 235 F.3d at 1012. A particular officer is liable "if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Id.* (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985)). Indeed, participation in the decision to violate a right is sufficient to impose liability under Section 1983. *Sheik-Abdi*, 37 F.3d at 1248. Lieutenant Haueter is liable for participating in the decision to drive Bartz to the Columbia County Jail.

Deputy Hollander should be held directly liable as well. He participated in the unlawful detention and knew that the sole purpose of the seizure was to search for evidence to justify the seizure. His participation and knowledge establish direct liability.

In sum, Bartz was subjected to an illegal seizure. Officers transported him to the jail with the express intention of searching for evidence to justify the seizure. This is the exact example of "unreasonable delay" cited by the *McLaughlin* Court. This Court should reverse the District Court's decision.

## III. The Defendants violated Bartz's Fourth Amendment rights when they repeatedly searched him in the jail.

The illegal seizure was not the only violation of Bartz's rights. When he was at the jail, he was excessively and repeatedly searched. Not only was Bartz subjected to an invasive body scan, but directly before and even during the scan, Defendant Wolfgram frisked Bartz and searched his pockets (several times) even though Bartz had already been frisked and searched at the site of the traffic stop. Under the circumstances, such repeated searches were not only unnecessary, but also unconstitutional as a matter of law because (1) Bartz's detention was unlawful by the time he reached the jail and (2) even if the detention were lawful, the searches were unreasonable. The District Court should have granted Bartz's motion for partial summary judgment as to liability with regard to the searches at the jail.

As an initial matter, the searches were unlawful because they were the result of an unlawful seizure. As argued above, Bartz's seizure was unlawful because law enforcement de facto arrested him with the explicit intention of gathering evidence to justify the arrest. They made no movement toward a judicial probable cause determination and engaged in the exact "unreasonable delay" the *McLaughlin* Court explicitly proscribed. *See McLaughlin*, 500 U.S. at 56. The analysis of the searches should begin and end there. To be clear, if the

Court determines that officers violated Bartz's rights under *Gerstein*, the searches must all fall as well.

But even if Bartz were lawfully seized (he wasn't), the search-incident-to-arrest exception cannot authorize repetitive, escalating searches that are unmoored from the justifications that gave rise to the exception. "[C]ustodial searches incident to arrest still must be reasonable ones." *Mary Beth G.*, 723 F.2d at 1270. Indeed, this "type of police conduct must still be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Id*. at 1270–71 (quoting *United States v. Edwards*, 415 U.S. 800, 808 n.9 (1974)) (cleaned up).

Analysis of the searches of Bartz must begin with an examination of the justifications underlying the search-incident-to-arrest exception in the correctional setting. Historically, the justification for the search incident to arrest centers on "the need to remove any weapons that the arrestee might seek to use in order to resist arrest or effect his escape and the need to prevent the concealment or destruction of evidence." *Id*. (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)) (cleaned up). With this danger in mind, the Supreme Court in *United States v. Robinson*, 414 U.S. 218, 235 (1973), allowed police to "be relieved of the responsibility of having to decide whether they could search a particular arrestee for weapons or contraband in the first instance."

In the correctional context, the safety rationale is especially acute. "The admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself." *Florence*, 566 U.S. at 330. Among these risks are contagious diseases, violence, and drugs. *Id*. at 330–32; *see Hudson v. Palmer*, 468 U.S. 517, 528 (1984). Accordingly, "[d]etecting contraband concealed by new detainees…is a most serious responsibility." *Florence*, 566 U.S. at 332. Thus, the justification for an intake search

lies not with a general interest in investigating crime but with the specific need to regulate what comes into an institution during the intake process.

But there are limits. An "extreme or patently abusive" search remains unconstitutional. *Mary Beth G.*, 723 F.2d at 1270. And more importantly, an intake search is just that—an *intake* search. If there is no intake, there can be no intake search because the rationale justifying such a search evaporates.

Bartz cannot smuggle contraband into a jail where he was not being booked. Thus, the searches of Bartz cannot be justified by the need for safety and security of the institution because there was no plan for Bartz to enter the institution. The searches must be otherwise reasonable. They are not.

Consider first the body scan. The District Court downplayed the invasive nature of the body scan, dismissing the duration as "brief" and noting that it took place "in a private area of the jail while [Bartz] was fully clothed." R. 49 at 9. It cites two cases that purport to support its analysis: *Brown v. Polk County*, 965 F.3d 534 (7th Cir. 2020), and *Haro v. Porter County*, 129 F.4th 992 (7th Cir. 2025). Neither of these cases carries the weight the District Court assigned it.

In *Brown*, a county jail inmate sued after she was subjected to a body cavity search. This Court determined that the search did not violate the Fourth Amendment. Its analysis proceeded in two parts. First, it concluded that the search, despite its highly invasive nature, was justified by the weighty security interest at stake in the jail environment. 965 F.3d at 540. Second, this Court examined the scope of the search, the manner in which it was conducted, and the place in which it occurred. *Id*. On this count, this Court again upheld the search, concluding that the search was "carried out with careful attention to limiting its scope and minimizing intrusion." *Id*. at 541. "The search was performed pursuant to a written policy with defined procedures that required reasonable suspicion and approval

from the jail's chief deputy," was "conducted in a medical setting by licensed medical professionals," and was undertaken "outside the presence of any officers." *Id*.

In *Haro*, a college student was subjected to a body cavity search after clothing fasteners that she was wearing caused a body scan to turn up "a single, dark, oval-shaped object in Haro's pelvic region." 129 F.4th at 995. The plaintiff conceded that the "anomaly on the scan gave rise to reasonable suspicion of concealed contraband and justified the initiation of a strip search," yet argued that "it was unreasonable for [the officer] to proceed with the most intrusive and humiliating steps of the search." *Id*. at 997. This Court upheld the search, relying on the security interests in the jail setting as well as the novel nature of the argument that "reasonable suspicion was dispelled partway through a strip search." *Id*. at 997–98.

The District Court determined that because the Seventh Circuit upheld these body-cavity searches, the body scan was reasonable. R. 49 at 9. Although it correctly stated that "Bartz's situation can't fully be justified by general jail policies, because he was brought to the jail for the purpose of conducting the body scan," the cases it relied on did just that. R. 49 at 8.

Indeed, the searches in *Brown* and *Haro* cannot be divorced from their context. Both *Brown* and *Haro* involved subjects who were either already incarcerated (*Brown*) or were in the process of being booked into the jail (*Haro*). Bartz had neither of these statuses. He was not incarcerated, and he was not being booked. Both Courts justified the searches at issue with heavy reliance on the specific security interests under consideration in the jail context. *Brown*, 965 F.3d at 540; *Haro*, 129 F.4th at 998. Without that interest, the rationale behind the searches in *Brown* and *Haro* would collapse. And without that interest, the invasive body scan of Bartz cannot be justified. Defendants have also pointed to no "written policy with

defined procedures" such as that relied upon by the *Brown* Court. 965 F.3d at 541. Neither *Brown* nor *Haro* can serve to justify the scan.

The District Court also determined that there was reasonable suspicion to conduct the scan based on (1) the K-9 alert; (2) Hollander saw Bartz grab something out of the center console; (3) a frisk revealed no drugs; (4) a search of the truck revealed no drugs; and (5) the K-9 didn't alert on the truck when Bartz wasn't inside it. R. 49 at 8. These facts do not constitute reasonable suspicion that contraband was inside Bartz and cannot justify the search. Hollander testified as to what he observed: "I don't recall anything more than watching the passenger reach into – open the center console, reach into it, and then close the center console." R. 22 at 14:15–18. He described nothing that would indicate that Bartz moved his body in a way that would allow him to stash anything in a body cavity. The inference that any drugs must be inside Bartz's body is speculative at best, coming nowhere close to the anomaly on the scan that provided reasonable suspicion for the search in *Haro*. 129 F.4th at 997.

Defendant Bahr conducted the scan and is directly liable. She operated the body scanner, knowing that Bartz was at the jail only for investigative purposes and was not being booked. Before the scan, she had been informed about the traffic stop, the K-9 search, and that Bartz had been brought in solely for the body scan. R. 29-1 at 01:55:30–01:56:00. Defendants Messer and Haueter are also directly liable for the illegal body scan because they set in motion the sequence of events leading to the unlawful scan and indeed ordered that it take place. *See Brokaw*, 235 F.3d at 1012.

The repeated frisks and pocket searches fare no better. The rationale underlying the search-incident-to-arrest doctrine had vanished by the time Wolfgram conducted his series of searches. These searches were not the result of a split-second "first instance" judgment

about how to conduct a roadside search of a newly arrested suspect. *See Robinson*, 414 U.S. at 235.

When Bartz arrived at the jail, Wolfgram knew that the plan was that Bartz was coming in just for the body scan. R. 23 at 10:1–5. He also knew that Messer had already frisked Bartz. *Id*. at 14:17–20. And he had no reason to believe that Bartz was armed or dangerous, let alone both. *Id*. at 15:3–13; *see United States v. Leo*, 792 F.3d 742, 748 (7th Cir. 2015). Yet Wolfgram still *twice* frisked Bartz and *twice* searched his pockets. R. 29-1 at 01:50:48–01:53:40. Bartz did not consent to any of these searches. R. 23 at 17:16–18. The searches revealed the same thing as Messer's previous searches: nothing.

Consider the sequence of events. Knowing that Bartz had already been frisked, Wolfgram frisked him again upon his arrival at the jail. Even if this search was reasonable (it wasn't), then surely an identical frisk moments later, this time accompanied by a pocket search, was not. And even if this search was reasonable (again, it wasn't), then certainly Wolfgram's subsequent rifling through Bartz's pockets after he had removed his clothing was unreasonable. There was no new information, no fresh threat, and no intervening event that would justify returning to a well that had several times previously been found to be dry. And by this point, Bartz was being scanned and was not within arm's reach of the clothes he had removed. *United States v. Brunilda Garcia*, 605 F.2d 349, 353 (7th Cir. 1979) (explaining that "[t]he search incident to arrest exception embraces warrantless searches of both the arrestee's person and the area within the arrestee's immediate control" only). Deputy Wolfgram conducted the searches and is directly liable for the violation of Bartz's rights.

Bartz was not being booked into the jail. Without an intake, there cannot have been an intake search. And searches incident to arrest must still be reasonable. The unnecessary repetitive searches of Bartz were not.

## IV. The individual defendants are not entitled to qualified immunity.

The District Court did not address qualified immunity because it determined that Bartz's rights were not violated. As explained above, this conclusion was error. Consequently, this Court should address qualified immunity and determine that the individual defendants are not entitled to qualified immunity.

Qualified immunity protects government officials from liability for civil damages where their conduct does not violate a clearly established statutory or constitutional right. Government officials are not protected by qualified immunity when (1) they violate a person's constitutional right and (2) that right is clearly established. *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018). In determining whether a right is clearly established, the Supreme Court has "expressly rejected a requirement that previous cases be 'fundamentally similar.'" *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002). Indeed, a plaintiff can meet the second prong of the qualified immunity analysis by pointing to analogous case law, showing that the contours of the right are sufficiently clear, or by showing that the constitutional violation was obvious. *Reed*, 906 F.3d at 547.

Case law need not be directly on point; "officials can still be on notice that their conduct violates established law in novel factual circumstances." *Id.* (cleaned up) (quoting *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009)). A "right can be clearly established if the legal landscape surrounding the right clearly establishes the contours of the right." *Smith v. Finkley*, 10 F.4th 725, 743 (7th Cir. 2021). "The crucial question is whether the official acted reasonably in the particular circumstances that he or she faced." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (cleaned up) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

*Gerstein* and *McLaughlin* themselves clearly established Bartz's Fourth Amendment rights in this situation. Since 1975 when the United States Supreme Court decided *Gerstein*,

it has been clearly established that the Fourth Amendment requires a prompt, neutral judicial determination of probable cause "as a prerequisite to extended restraint of liberty following arrest." *Gerstein*, 420 U.S. at 114. And since 1991, when *McLaughlin* refined *Gerstein*'s rule to explicitly forbid delays following arrest for "gathering evidence to justify the arrest," that principle has been similarly clear. *McLaughlin*, 500 U.S. at 56. *Gerstein* and *McLaughlin* provide a bright line. Defendants crossed it.

Cases from this circuit confirm the settled nature of the *Gerstein*/*McLaughlin* rule. In *Willis*, discussed above, the Court simply applied the rule that a warrantless arrest cannot be used as an investigatory tool and can be employed only to secure prompt judicial review. 999 F.2d at 288–89. That is all this Court needs to do, as well.

Similarly, in *Lopez v. City of Chicago*, 464 F.3d 711, this Court upheld a grant of summary judgment to a plaintiff who had been held longer than *McLaughlin*'s 48-hour window. *Id*. at 722. In doing so, it flatly rejected an argument that *McLaughlin* provided a mere procedural safeguard rather than a core constitutional right. *Id*. at 721. But more importantly for our purposes, the Court did not waver on the key principle applicable here: "*McLaughlin* held *unequivocally* that delays for purposes of gathering evidence are per se unreasonable." *Id*. at 722 (emphasis added). No reasonable officer who read *Lopez* and *McLaughlin* would believe that, absent a warrant, it was constitutional to bring someone to a jail for the sole purpose of searching him.

Other circuits echo these determinations, routinely denying qualified immunity when *Gerstein* and *McLaughlin* are violated. For example, in *Cherrington v. Skeeter*, 344 F.3d 631, the Sixth Circuit denied qualified immunity on the basis that *McLaughlin* itself "clearly established" the right to a judicial determination of probable cause within 48 hours without excessive delay. *Id*. at 644; *see also Brown v. Knapp*, 75 F.4th 638, 655 (6th Cir. 2023) ("*Cherrington* established in 2003 that officers are assumed to be aware of an individual's

right to a probable cause determination within 48 hours."). Likewise in *Brown v. Knapp*, the Sixth Circuit again denied qualified immunity on the basis of *McLaughlin* itself, writing that it was "clearly established at the time of Brown's arrest that her arresting officers had a duty to take her before a magistrate for a probable cause hearing" and that the defendants "made no efforts to do so." *Brown*, 75 F.4th at 655; *see also Webb v. Thompson*, 643 F. App'x 718, 723 (10th Cir. 2016) (citing *McLaughlin* for the proposition that "it is clearly established that an arrestee is entitled to a prompt probable cause determination"); *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1483 (9th Cir. 1993) (concluding that the "law was clearly settled" by *Gerstein* that the plaintiff "had a constitutional right to 'prompt' presentation to a judicial officer").

Just like in these cases, all the officers needed to do here is apply the clearly established maxim from *McLaughlin*: "gathering additional evidence to justify the arrest" is a per se unreasonable delay. 500 U.S. at 56. *McLaughlin* was clear and specific, and subsequent cases from this circuit and others confirm the bright-line rule. Defendants are not entitled to qualified immunity on the illegal seizure claim.

Likewise, Defendants are not entitled to qualified immunity on the illegal search claims. It is clearly established that a search incident to arrest requires a *lawful* arrest. *Huff*, 744 F.3d at 1009. Because the searches here were the result of an illegal seizure, they must also fall. And it is clearly established that a frisk requires that the officer have an "articulable suspicion that the person is both armed and a danger to the safety of officers or others." *Leo*, 792 F.3d at 748. However it is sliced, Defendants are not entitled to qualified immunity.

## CONCLUSION

For the reasons stated, this Court should reverse the judgment below and remand to the District Court with directions to grant Bartz's motion for partial summary judgment against Defendants Messer, Hollander, and Haueter as to the illegal seizure; Defendants

Messer, Haueter, and Bahr as to the illegal body scan; and Defendant Wolfgram as to the illegal frisk.

Respectfully submitted,

Dated: 4 June 2026,

STRANG BRADLEY, LLC
Attorneys for Plaintiff-Appellant

/s/Jacob M. Stroup
Jacob M. Stroup
Wisconsin Bar No. 1089159
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722
William E. Grau
Wisconsin Bar No. 1117724
STRANG BRADLEY, LLC
613 Williamson St., Ste. 204
Madison, WI 53703
(608) 535-1550
Jacob@StrangBradley.com
John@StrangBradley.com
Rick@StrangBradley.com
William@StrangBradley.com

CERTIFICATE OF COMPLIANCE WITH CIR. R. 32(c)

The undersigned, counsel of record for the Plaintiff-Appellant furnishes the following in compliance with Circuit Rule 32(c):

I hereby certify that this Brief conforms to the rules contained in Circuit Rule 32(c) for a brief produced with a proportionally spaced serif font. The length of the brief is 11,706 words.

Dated this 4th day of June, 2026.

STRANG BRADLEY, LLC
Attorneys for Plaintiff-Appellant

/s/Jacob M. Stroup
Jacob M. Stroup
Wisconsin Bar No. 1089159
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722
William E. Grau
Wisconsin Bar No. 1117724

613 Williamson St., Ste. 204
Madison, WI 53703
(608) 535-1550
Jacob@StrangBradley.com
John@StrangBradley.com
Rick@StrangBradley.com
William@StrangBradley.com

CERTIFICATE OF SERVICE

The undersigned, counsel of record for the Plaintiff-Appellant hereby certifies that on June 4, 2026, an electronic copy of the Appellant's Brief was served on counsel for Defendants-Appellants.

Dated this 4th day of June, 2026.

STRANG BRADLEY, LLC
Attorneys for Plaintiff-Appellant

/s/Jacob M. Stroup
Jacob M. Stroup
Wisconsin Bar No. 1089159
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722
William E. Grau
Wisconsin Bar No. 1117724

613 Williamson St., Ste. 204
Madison, WI 53703
(608) 535-1550
Jacob@StrangBradley.com
John@StrangBradley.com
Rick@StrangBradley.com
William@StrangBradley.com

STATEMENT OF COMPLIANCE WITH CIRCUIT RULE 30(d)

I hereby certify that all of the materials required by Circuit Rule 30(a) and (b) are included in this appendix, and that such materials are included in an appendix bound with the foregoing brief because they do not exceed 50 pages, pursuant to Circuit Rule 30(b)(7).

Dated this 4th day of June, 2026.

STRANG BRADLEY, LLC
Attorneys for Plaintiff-Appellant

/s/Jacob M. Stroup
Jacob M. Stroup
Wisconsin Bar No. 1089159
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722
William E. Grau
Wisconsin Bar No. 1117724

613 Williamson St., Ste. 204
Madison, WI 53703
(608) 535-1550
Jacob@StrangBradley.com
John@StrangBradley.com
Rick@StrangBradley.com
William@StrangBradley.com

**INDEX TO PLAINTIFF-APPELLANT'S SHORT APPENDIX**

*Bartz v. Columbia County, et al.*, 3:24-cv-671
Opinion and Order on Summary Judgment [ECF 49]
Filed March 2, 2026........................................................................ SA 01-10

*Bartz v. Columbia County, et al.*, 3:24-cv-671
Judgment in a Civil Case [ECF 50]
Filed March 2, 2026...............................................................................SA 11

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JUSTIN BARTZ,

Plaintiff,

v.

COLUMBIA COUNTY, ROBIN MESSER, NOAH HOLLANDER, SCOUT BAHR, JILL OSTRANDER, MITCHELL WOLFGRAM, and JORDAN HAUETER,

Defendants.

OPINION and ORDER

24-cv-671-jdp

---

Defendant Robin Messer, a deputy and canine handler with the Columbia County Sheriff's Office, stopped a truck for a minor traffic violation. Plaintiff Justin Bartz was a passenger in the truck. Messer's drug-sniffing K-9 alerted to the presence of a controlled substance at the truck. But Messer didn't find any drugs after patting down Bartz and searching the truck. Messer handcuffed Bartz, put him in his squad car, and drove him to the Columbia County Jail. There, Bartz was patted down and a scan of his body was taken using the jail's body scanner. Bartz was released after the scan showed he didn't have drugs in his clothing or body cavities. Bartz contends that defendants violated his Fourth Amendment rights by detaining him to conduct additional searches at the jail.

Both sides move for summary judgment. Bartz moves for summary judgment against the individual defendants. Dkt. 26. Defendants move for summary judgment on all claims. Dkt. 32. Bartz contends that he was detained so that law enforcement officers could develop evidence that would justify his detention. But the undisputed facts show that defendants had probable cause to detain Bartz based on evidence acquired during the traffic stop, and the

search for additional evidence did not violate Bartz's Fourth Amendment rights. The court will grant summary judgment to defendants and dismiss this case.

BACKGROUND

The court draws the following facts from the officers' body camera footage and from the parties' proposed findings of fact. These facts are undisputed.

This case arises from a traffic stop, the legitimacy of which Bartz does not contest. The material facts begin when defendant deputy Robin Messer's K-9 alerted to the odor of a controlled substance. After Messer's K-9 alerted, Messer spoke with plaintiff Justin Bartz, who said that there was nothing in the truck and that he doesn't even smoke marijuana. Messer asked Bartz to exit the truck and, with Bartz's permission, patted him down. Messer found no drugs on Bartz. Messer put Bartz in his squad car while he searched the truck. Messer found no drugs inside the truck either. Messer's K-9 did not alert when he sniffed inside the truck.

Messer went back to his squad car and asked Bartz when he last used drugs. Bartz at first said he couldn't remember. Messer asked Bartz if Bartz and the truck's driver had used drugs earlier that evening, and Bartz admitted that they had smoked marijuana about 30 to 45 minutes before the traffic stop. Messer put Bartz back in his squad car, and then he called his supervisor, defendant Jordan Haueter, a lieutenant with the Sheriff's Office. Messer asked Haueter if he could bring Bartz and the truck's driver to the Columbia County Jail and scan their bodies using the jail's body scanner. Haueter agreed that Messer could do so.

Messer went back to his squad car and told Bartz he was being taken to the jail. Messer had Bartz step out of his squad car so that he could put him in handcuffs. Bartz said: "So, you're placing me under arrest." Dkt. 35, Ex. 3 (Messer Body Cam, at 01:06:49–01:06:50).

Messer responded: "Nope. You're just detained." *Id.* at 01:06:50–01:06:51. Messer also said: "And if you don't have anything on you, then you get released." *Id.* at 01:07:04–01:07:07. Then, Messer handcuffed Bartz, put him back in his squad car, and drove him to the jail.

Upon Bartz's arrival at the jail, defendant Mitchell Wolfgram, a deputy with the Sheriff's Office who worked as a jailer, patted Bartz down. Wolfgram didn't find any drugs. Defendant Jill Ostrander, also a deputy and jailer, told Messer that the buttons on Bartz's jeans would show up on the body scanner, so she had Wolfgram put Bartz in jail uniform pants. After Bartz changed, defendant Scout Bahr, another deputy and jailer, had him step into the body scanner and then scanned his body. While Bartz was being scanned, Wolfgram looked through Bartz's jeans, sweater, and boots; he didn't find any drugs. The scan of Bartz's body didn't show any drugs on him or in his body cavities. Bartz was released without charges.

Additional facts will be discussed where pertinent to the analysis.

## ANALYSIS

The Fourth Amendment prohibits unreasonable searches and seizures. The essential question is whether defendants' actions were objectively reasonable under the circumstances. *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc). Bartz contends that defendants violated the Fourth Amendment in two ways: first by unlawfully arresting him, and then by conducting unlawful searches at the jail.

Both sides move for summary judgment on the main liability issues. The court will grant summary judgment if the material facts are undisputed and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When faced with cross-motions, courts apply the same summary judgment standards, viewing the facts and all reasonable inferences

from those facts in favor of the non-moving party for the motion under consideration. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). The question is whether there is admissible evidence that would support a reasonable jury verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**A. Unlawful arrest**

Bartz contends that defendants unlawfully arrested him. Dkt. 27, at 9.[1] Officers violate the Fourth Amendment if they arrest an individual without probable cause. *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009). The existence of probable cause is an absolute defense to unlawful arrest claims. *Lyberger v. Snider*, 42 F.4th 807, 811 (7th Cir. 2022). Probable cause to arrest exists if a reasonable officer with the same knowledge as the arresting officer would have believed that the arrestee had probably committed a crime. *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010).

Messer had probable cause to arrest Bartz based on two key facts. First, Messer's K-9 alerted to the presence of a controlled substance. It is undisputed that Messer's K-9 is certified to detect the odor of controlled substances and trained to alert upon detection, so the reliability of the alert is not at issue. *See Florida v. Harris*, 568 U.S. 237, 246–47 (2013). Messer would have had probable cause to arrest Bartz based solely on the K-9's alert. *See Florida v. Royer*, 460 U.S. 491, 506 (1983). Second, Bartz told Messer that he had smoked marijuana about 30 to 45 minutes before the traffic stop. An officer has probable cause to arrest an individual when the officer smells marijuana and can localize the odor to that individual because the officer has reason to believe that person has committed the crime of possession of marijuana.

[1] Citations to filings from the docket use the page numbers assigned by CM/ECF, not the page numbers in the original document.

*United States v. Paige*, 870 F.3d 693, 700 (7th Cir. 2017). Messer didn't need to smell marijuana to suspect that Bartz had probably possessed marijuana: Bartz admitted that was the case. Messer did not unlawfully arrest Bartz.

Bartz resists this conclusion with two arguments. First, Bartz argues that, even if Messer had probable cause to arrest him, the arrest was nevertheless unlawful because Messer didn't intend to arrest him. *See* Dkt. 27, at 9–18. Bartz points out that Messer told him that he was *not* under arrest during an exchange immediately before Messer transported Bartz to the jail:

> Bartz: So, you're placing me under arrest.
>
> Messer: Nope. You're just detained. . . . And if you don't have anything on you, then you get released.

Dkt. 35, Ex. 3 (Messer Body Cam, at 01:06:49–01:06:51, 01:07:04–01:07:07). This is just a semantic quibble: it doesn't matter whether Messer subjectively intended to "arrest" Bartz or merely "detain" him, because whether an individual is under arrest is an objective inquiry. *Tebbens v. Mushol*, 692 F.3d 807, 816 (7th Cir. 2012); *United States v. Garcia*, 376 F.3d 648, 651 (7th Cir. 2004); *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 719 (7th Cir. 2013). All that matters is whether a reasonable person in Bartz's position would have thought he was free to leave. *See Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003). If an individual is "handcuffed, read his rights, and transported to the police station in a police car," then he has been arrested. *Adams v. Szczerbinski*, 329 F. App'x 19, 24 (7th Cir. 2009). Bartz wasn't read his rights, but he was handcuffed, placed in the back of a squad car, and driven to a jail—classic hallmarks of being arrested. That Messner referred to this as "detention" doesn't make it unlawful.

Second, Bartz contends that his arrest was unlawful because Messer arrested him solely to conduct a body scan to justify his arrest. *See* Dkt. 27, at 11–18. To support his contention, Bartz points to a line of cases addressing the need for a probable cause hearing promptly

following a warrantless arrest. *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975). Officers violate the Fourth Amendment when they unreasonably delay the probable cause hearing to gather evidence to justify the arrest. *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). Bartz also points to an Eastern District of Wisconsin case, which held that detaining an individual for any period of time with no intention of charging her with a crime was unreasonable under *Gerstein* and *Riverside*. *Farr v. Paikowski*, No. 11-C-789, 2013 WL 1288041, at *1 (E.D. Wis. Mar. 25, 2013); *see also id.*, 2013 WL 160268, at *7 (E.D. Wis. Jan. 14, 2013).

Bartz analogizes his case to *Farr* and argues that defendants violated the Fourth Amendment by detaining him solely to take a scan of his body. *See* Dkt. 27, at 18. But the Seventh Circuit rejected the argument Bartz makes here in *United States v. Daniels*, 64 F.3d 311 (7th Cir. 1995). The plaintiff in *Daniels* argued that officers unreasonably delayed his probable cause hearing because they put him in a line-up while he was in custody. *See id.* at 314. The Seventh Circuit held that the line-up was lawful because it was done to collect *more* evidence against the plaintiff rather than to *justify* his arrest. *Id.* The Seventh Circuit reasoned:

> Daniels' argument seems to interpret *Riverside* to preclude law enforcement from bolstering its case against a defendant while he awaits his *Gerstein* hearing; that is a ludicrous position. *Gerstein* and its progeny simply prohibit law enforcement from detaining a defendant to gather evidence to justify his arrest, which is a wholly different matter. Probable cause to arrest Daniels already existed and that is what Ewer's affidavit reported. We therefore reject Daniels' contention that he did not receive a prompt *Gerstein* hearing.

*Id.* In this case, Messer had probable cause to arrest Bartz before transporting him to the jail, so conducting further searches of Bartz at the jail to bolster the case against him was not unlawful under *Gerstein* and *Riverside*. *Farr* didn't address *Daniels*, and for that reason, its reasoning is not persuasive. Bartz's arrest was lawful.

**B. Unlawful searches**

Bartz contends that the searches of him at the jail were unlawful because they were excessive and repetitive. *See* Dkt. 27, at 21–24. At the jail, Wolfgram patted down Bartz twice, Bahr took a scan of Bartz's body using the jail's body scanner, and Wolfgram looked through the pieces of clothing Bartz had removed for the body scan. Bartz argues that the searches were unnecessary because Messer had already searched him at the scene of the traffic stop and didn't find anything. *See id.* at 22.

Bartz is essentially arguing that the jail searches were unreasonable because defendants no longer had reason to suspect that he was concealing contraband. Bartz is correct that searches typically require individualized suspicion. *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 (1976). But jails are "unique place[s] fraught with serious security dangers," including the smuggling of drugs or other contraband. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Consequently, the Supreme Court has recognized that jails may enforce generally applicable suspicionless search policies. *See id.* at 558–60; *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330 (2012). But suspicionless searches still must be reasonable to satisfy the Fourth Amendment. *See Haro v. Porter Cnty.*, 129 F.4th 992, 996–97 (7th Cir. 2025). To evaluate whether a search is reasonable, courts weigh the need for the search against how invasive the search is, considering the search's scope, the manner in which it is conducted, and where the search is conducted. *Id.* at 997.

Bartz was searched at the jail pursuant to generally applicable jail policies, so individualized suspicion was unnecessary. It is undisputed that Columbia County Jail requires officers to pat down every arrested individual arriving at the jail, even if that individual was already searched by other officers. It is also undisputed that jail policy requires officers to look

through an individual's clothing in case something was missed during the pat-down search. And it is undisputed that jail training requires officers to scan the body of every person entering the jail. However, Bartz's situation can't fully be justified by general jail policies, because he was brought to the jail for the purpose of conducting the body scan.

But even if Bartz had been singled out for the searches, such that the policies were applied on an individual rather than general basis, defendants had reasonable suspicion to support the searches. A reasonable officer could have believed that Bartz was concealing drugs in a body cavity given that: (1) Messer's K-9 alerted to the truck; (2) Hollander saw Bartz grab something out of the truck's center console; (3) Messer didn't find any drugs after patting down Bartz outside the truck; (4) Messer didn't find any drugs inside the truck; and (5) the K-9 didn't alert after searching the truck without Bartz inside of it. The drugs weren't in the truck and they weren't *on* Bartz's person, so a reasonable officer could have deduced that they might be *in* Bartz's person, meaning in one of his body cavities.

Bartz contends that even if there had been individualized suspicion, the body scan was unreasonably invasive. Body scans are images of the inside of an individual's body; they "reveal concealed objects that are of a different density than human tissue." *Id.* at 995. Defendants used the jail's body scanner to produce three X-ray images of Bartz's body. *See* Dkt. 30, Ex. 5. It is undisputed that Bartz had to change into jail uniform pants, but he did not need to remove his shirt or underwear. *See* Dkt. 48, ¶¶ 119, 120. The body scan took just under a minute, measured from the time Bartz stepped into the machine to the time he stepped out of it. Dkt. 35, Ex. 3 (Messer Body Cam, at 01:56:39–01:57:37).

Bartz's body scan was far less intrusive than searches the Seventh Circuit has found to be reasonable. Consider a pair of recent cases. In *Brown v. Polk County*, 965 F.3d 534 (7th Cir.

2020), the court held that visually and physically inspecting an inmate's genitals was reasonable because the search was conducted according to a written policy, in a private setting, by licensed medical professionals, and within a reasonable timeframe. *See Brown*, 965 F.3d at 541. In *Haro v. Porter County*, the court held that instructing an arrestee to take off her clothing, bend over, and spread her buttocks for a visual inspection of her body was reasonable because the search was conducted in a private area, and the inspection lasted only 10 to 20 seconds. *Haro*, 129 F.4th at 995, 999. In this case, Bartz's body was briefly X-rayed in a private area of the jail while he was fully clothed. The body scan was not unreasonable.

The undisputed facts in this case establish that defendants did not violate the Fourth Amendment by transporting Bartz to the jail, briefly detaining him there, and conducting additional searches, including a body scan. Defendants' actions were not unconstitutional, so the court need not address qualified immunity. Nor does the court need to address Bartz's failure-to-intervene claims or his claim that Columbia County is liable under *Monell*, because these claims would require an underlying constitutional violation by an individual defendant.

## ORDER

IT IS ORDERED that:

1. Plaintiff Justin Bartz's motion for partial summary judgment, Dkt. 26, is DENIED.
2. Defendants Columbia County, Robin Messer, Noah Hollander, Scout Bahr, Jill Ostrander, Mitchell Wolfgram, and Jordan Haueter's motion for summary judgment, Dkt. 32, is GRANTED.

3. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered March 2, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JUSTIN BARTZ,

Plaintiff,

v.

Case No. 24-cv-671-jdp

COLUMBIA COUNTY, ROBIN MESSER, NOAH HOLLANDER, SCOUT BAHR, JILL OSTRANDER, MITCHELL WOLFGRAM, and JORDAN HAUETER,

Defendants.

---

JUDGMENT IN A CIVIL CASE

---

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendants dismissing this case.

/s/ Deputy Clerk
Joel Turner, Clerk of Court

3/2/2026
Date